WILSON *vs.* WALL AND WIFE.

[BILL IN EQUITY FOR RECOVERY AND PARTITION OF LAND.]

1. *Construction of Dancing Rabbit Creek treaty.*—Under the 14th article of the treaty between the United States and the Choctaw Indians, concluded at Dancing Rabbit creek on the 15th September, 1830, the reservation to which each "head of a family" was entitled is limited to one section, or six hundred and forty acres of land ; and the other reservations, *to* or *for* each child of the family, were intended to confer a beneficial interest, on the children themselves, either to them directly, or to their parents in trust for them.

2. *Construction of treaties generally.*—Treaties are the supreme law of the land ; rights which have vested under them, cannot be destroyed or affected by the action of either the legislative or the executive department of the government, nor by the rules of practice adopted by the officers of any department of the executive government ; nor are the courts, in determining those rights, to be controlled by the action or rules of practice of the other departments of the government.

3. *Title to Indian reservation.*—Although the treaty itself establishes the existence and extent of the right which the beneficiaries take in the reservation thereby secured to them, yet the title to the particular lands to which each was entitled is conveyed by the patent subsequently issued.

4. *Trust implied against holder of legal title.*—A patent being issued to a Choctaw Indian "and his heirs," for all the lands to which he and his several children were entitled as their reservations under the treaty of 1830, a court of equity will hold the legal title subject to the equitable rights secured to the children by the treaty.

5. *Who is purchaser for valuable consideration without notice.*—A purchaser from a Choctaw Indian, knowing that his vendor claimed the land as his reservation under the treaty of 1830, is not entitled, as against the children of his vendor, to protection as a purchaser for valuable consideration without notice.

APPEAL from the Chancery Court of Sumter.

Heard before the Hon. WADE KEYES.

THE bill in this case was filed by the appellees, who were the surviving children and heirs-at-law of William Hall, deceased, against Samuel Wilson and others; and sought to recover a certain tract of land, which the complainants claimed as hereinafter more particularly stated, to have the land partitioned among themselves, and to make the defendants account for the rents and profits while in their possession. The lands in controversy, amounting in all to 2240 acres, were patented by the United States to said William Hall "and his heirs," on the 29th June, 1841, as his reservation under the treaty with the Choctaw Indians, concluded at Dancing Rabbit creek, on the 15th September, 1830; and were claimed by the complainants partly as reserved to or for them under the provisions of the treaty, and the residue by descent from their said ancestor; while the defendants claimed under several purchases and conveyances from said William Hall. The defendants answered, and severally denied the material allegations of the bill respecting the rights asserted by the complainants. By agreement of counsel, the defendants were allowed to sever, and the cause was heard as to the defendant Wilson, on the following agreed statement of facts:

"It is admitted and agreed, that the south-east quarter, and the south half of the north-east quarter, of section fourteen, township eighteen, range one, east, referred to in the complainants' bill, and sought to be recovered of Wilson, form a part of the lands occupied by the Choctaw tribe of Indians at the date of the treaty of 15th September, 1830, concluded at Dancing Rabbit creek, between the United States and said tribe of Indians, and constitute a portion of the tract reserved to or in the name of William Hall under the 14th article of said treaty, and embraced in the patent issued by the United States to said William Hall, dated 29th June, 1841; a copy of which patent is hereto annexed, and made a part of this agreed case. Also, that William Hall has died since the issuance of said patent; that the complainants, Catharine, Jane, Margaret, Sarah and Joseph, are the children of said William Hall, who resided with him at the date of

said treaty; and that said William then had two other children living with him, Silas and Eliza Anne by name, who, since the making of said treaty, and before the institution of this suit, have died without issue. Also, that said William Hall claimed the lands described in said patent, as the 'Choctaw head of a family,' under and by virtue of the 14th article of said treaty; that in asserting his claim to the reservation granted, he reported himself to the United States agent as the 'Choctaw head of a family,' living on said lands at the date of the treaty, and having an improvement thereon, with — children over ten years of age living with him, and — children under ten years of age; and that the names of the children were neither taken down, nor reported by the agent to the government. Also, that upon William Hall's fulfilling the five years residence on the land after the ratification of the treaty, the grant in fee, a copy of which is hereto annexed, was issued to him. Also, that the defendant Wilson, in good faith, on the 13th December, 1834, made the contract with said Hall for the purchase of the lands in question, a copy of which is annexed to his answer; that he paid Hall the purchase-money, amounting to $750, and on the 29th February, 1836, received from Hall a deed of conveyance for the land, with clause of warranty of title, went into possession thereof, has been in possession since, and made thereon valuable improvements,—the extent of their value to be ascertained hereafter. There is no evidence that Wilson had notice of any outstanding claim or title to the land by the children of Hall, unless he [can] be charged with it from his answer and the foregoing facts agreed on. It is further agreed, that the business of carrying into effect the provisions of the treaty on the part of the United States appertained to the war department; that in ascertaining to whom the patents should issue for the lands, under the 14th article of the treaty, ,it was not usual or customary to take down or return to the department the names of the children of heads of families; but in executing this article of the treaty, the agent returned the names of the heads of families, with the number and ages of their children; and in issuing the grants in fee

simple under this article of the treaty, it was usual and customary to issue them in the same form with the patent to Hall, until the passage of the act of 1842, which changed the practice in issuing patents, as explained in the opinion of Attorney-General Legare, a copy of which is hereto annexed. It is further admitted, for the purpose of showing the practice of the government, prior to 1842, in issuing patents, that Alexander Brashears, Betsy Buckholts, John Walker, Betsey Pinson, and others, received patents for their respective reservations under the 14th article of the treaty, in the same form with that issued to Hall. It is admitted, also, that the land embraced in this agreed case formed a part of said William Hall's reservation under said 14th article of said treaty, but was no part of the section on which he lived at the date of the treaty. Under these agreed facts, each party reserves the right to insist, either in this court or in the appellate court, on any question which the facts may present."

The patent to William Hall, after reciting that he became entitled, under the 14th article of the treaty, "to three and a half sections of land out of the lands ceded to the United States by the said treaty," and that the lands specified in the patent "have been located in favor of said William Hall as his reserve," and that the location has been approved by the president of the United States, conveys the lands "unto the said William Hall and to his heirs forever."

On final hearing, the chancellor held, that William Hall, under the 14th article of the treaty, (for which see the opinion of the court,) took the single section of land on which he resided in his own right, and the remainder in trust for his children; and that the patent was notice to the defendant Wilson that the lands were subject to the trust. He rendered a decree in accordance with these views, ordering an account, partition, &c.; and his decree is now assigned as error.

LOMAX & PRINCE, for the appellant.—1. Though the phraseology of the 14th article of the treaty may be

untechnical and obscure, a critical analysis of its language will sustain the construction which has been placed upon it by the government in carrying out its provisions. It cannot be disputed, that the absolute property in the lands in question was vested in the United States; not merely in right of eminent domain, but actual and entire seizin and ownership. This is the principle on which the government has ever acted with regard to the aborigines, as exhibited in our colonial and national history; and it has been sanctioned by the uniform current of decisions. The treaty itself, as well as the grant, was the assertion and admission of this principle. The grant of June 29, 1841, by which the United States parted with its title, must alone determine what disposition the United States intended to make. The reservation expressed in the treaty cannot be construed as vesting title in the Indians: on the contrary, it is expressly a retention of title by the United States, which, in certain subsequent contingencies, the United States promised to part with. This reservation was a voluntary restraint, imposed by the United States on itself, against making any alienation of the land in the ordinay way. The treaty speaks of the reservation by itself, and of the grant by itself; and there is no inconsistency between the reservation and the grant to William Hall of all the lands embraced in it. The grant was made in strict conformity with all that was stipulated in the reservation, as regards both the person and the lands.

The treaty only describes the person who is contingently to be entitled to the reservation. He must be the Choctaw head of a family, and be desirous not only to remain, but also to become a citizen, and must signify to the agent his intention to do so. These are conditions precedent, (if conditions they can be called,) and rest, not so much on performance, as in a feeling of desirousness, and signifying his intention, and fitting himself to receive the proffered bounty of the government. The treaty then proceeds to make further provision in reference to the state and condition of the head of the family, and, before mentioning the children, says, "in like manner shall be entitled," &c. It does not say that the children

" in like manner shall be entitled," as would certainly have been expressed if so intended. The words can only refer to the head of the family, and must prevail throughout as to all that is reserved. They may be said to constitute the *habendum* and *tenendum* of the instrument, with no expression to restrict or qualify their import. The United States may have had the benefit of the children in view, and designed to promote it by enlarging the bounty to the parent. The word *for* may, in perfect consonance with its ordinary use, mean *because of* such child, or on account of having such child; and is entirely consistent with what had been previously declared, as to the person pointed out as the one entitled to the reservation. The other interpretation is inconsistent with the context, and requires the interpolation of other words expressive of an interest, legal or equitable, to be conferred on the child. As little reliance can be placed on the words, " *to each child;*" for it cannot be supposed, that by changing the word *for*, which is used in respect to the half-sections, into the word *to* in connection with the quarter-sections, any change in the sense was intended.

It would be a waste of words to argue, that the Choctaw head of the family, who is entitled to the section, is the same person to govern the verb *shall be entitled,* when the treaty proceeds to speak of the less quantities. The treaty nowhere treats these lands as the subject of divers reservations, no more than it does to divers persons. It is the one reservation, covering 640 acres, which is enlarged to embrace the adjoining locations, according to the number and ages of the children. The words are, " *Said reservation* shall include," &c. If it was intended that the 640 acres should be the separate location of the parent, it would seem reasonable that this particular section should include the present improvement of the head of the family; but the treaty is silent as to what particular part of the reservation shall include the improvement. Unless the reservation was intended as a unit, both as to the person entitled and as to the land, there is an incongruity in the promise that a *grant* in fee shall issue, which obviously contemplates but a single grant, while a reser-

vation to several could only be effected by divers grants to the respective portions.

Although each Choctaw head of a family and children are antecedents, it does not follow that the pronoun *they* includes the children. Whether the pronoun had been *he* or *they*, it would be alike general, and must receive a definite application from the context. Notwithstanding each Choctaw head of a family had been first spoken of in the singular, there was no departure from the rules of grammar, or from ordinary parlance, that the language may group all described by the pronoun *they*, in the provision made for all the heads of families, instead of repeating "each Choctaw head," &c. If *they* comprehends children as well as heads of families, then children are required to conform themselves to all the pre-requisites which are imposed on the heads of families, as respects both the reservation and the grant, for a compliancce with which they (those of tender years at least) would be utterly incapable. Suppose any of the children should leave their parent, and go abroad before the expiration of the five years, would the United States be then justified in withholding a grant to the entire tract of land, or in resuming so much as had been alloted to him on account of such child? If a trust for the children was designed, the simple and operative words would not have been omitted; for, in another part of the same instrument, where such intention manifestly prevailed, the appropriate and technical words to create a trust for the children are employed. 7 U. S. Statutes, p. 341, appendix, art. II.

2. Whatever interpretation this court might incline to put on this treaty, the patent alone can be referred to as the source of title. If the stipulations of the treaty have been violated, the parties complaining may apply to the justice or favor of the government for compensation. The children cannot claim participation in the lands conveyed by solemn act to Hall, though done in utter derogation of their rights. This grant, until impeached by proceedings in the appropriate judical forum to vacate or correct it, must be conclusive in all respects. As an act of the executive within its proper constitutional functions, it

must at least claim the deference of the other branches of the government, unless palpably unlawful and in violation of executive duty; more especially since this act originated with the treaty-making power, which is exclusively with the executive and the senate. And this deference should be more readily yielded, in view of the fact, which is shown by the agreed case, that this construction was persisted in by the government until 1842, when, perhaps, all the grants under this article of the treaty had been issued. A reversal of that practice now by the courts would produce incalculable disturbance, and would operate most oppressively on innocent purchasers, who have been resting on their title under the imposing authority which the uniform practice of the government had so long sanctioned. The complainants, then, cannot go behind the patent for a legal title, and their claim to an equitable title under it cannot be sustained.

3. It may well be questioned whether the doctrine of constructive trusts, as applied between individuals, can be recognized in regard to titles emanating from the government. It is admitted, however, to be an established principle, that conveyances, however completely the legal title in them may be assured to the grantee, may be subjected in equity to the equitable title in another. Here, there is no consideration proceeding from the complainants to confer on them a meritorious claim. They come in as volunteers, setting up a pretended trust against an absolute grant from the government, and against a purchaser under it for valuable consideration. There is no express trust declared in the grant, or in the conveyance from Hall. To make such declaration effectual, it must be made with the intention to create a trust, and must be plain and direct.—Lewin on Trusts, 147. The grant expressly refers to the treaty, and conveys to Hall a quantity of land, more than 640 acres, which could only have accrued to him because of the number and ages of his children; yet it declares that he is entitled to all this land, and grants it all to him, his heirs and assigns forever. If there be any trust for the children, it must be a constructive trust, which is negatived by the express

terms of the grant. All the authorities concur, that a trust is never implied or presumed, except in case of absolute necessity. How can this court build up on the words *for* and *to*, which are admitted by the chancellor to be of equivocal import, an equitable title in the children? The purchaser from Hall cannot be disturbed by such a claim, nor his conscience charged with such a trust. The equity itself is at least doubtful, and there is nothing in the patent to charge him.—Lewin on Trusts, 579; 2 Spence's Equity, 195.

4. If, as the complainants contend, a title vested in them under the treaty, which could not be affected or impaired by the subsequent action of the government, then their remedy is at law, and the prayer for partition among themselves cannot sustain their bill against the defendants.

In Newman v. Harris & Plummer, 4 How. Miss. 522, the question as to any title or interest in the children of the reservee did not arise, and was not decided; nor was there any evidence in that case of the practice of the government in issuing patents under the 14th article of the treaty. If that case be any authority at all in the case at bar, it is only to establish a *legal title* in the complainants

R. H. SMITH, *contra.*—1. The appellees contend, that under the 14th article of the treaty, the children of a Choctaw head of a family take estates, legal or equitable, such as the parent cannot alien; and insist, that this construction is apparent from a consideration of the language of the 14th article, from the whole treaty, from the object and design of the parties, and from the effect of a contrary construction. The construction for which the appellees contend, was adopted in Pickens v. Harper, 1 Sm. & Mar. Ch. 539. See, also, Newman v. Harris & Plummer, 4 How. Miss. 564. The 14th article of the treaty is itself a grant, and operates as such, subject to be defeated on non-performance of the conditions.—Newman v. Harris & Plummer, 4 How. Miss. 560. This view is supported by the opinion of Mr. Attorney-General Legare, and

results from the constitutional provision that treaties are the supreme law of the land.

The terms by which the half-sections and quarter-sections are secured, are fit and apt expressions to create a trust. Indeed, the word *to*, applied to the quarter-sections, might well justify the position that the grant is to the child directly. But the appellees' case is sufficiently made out, by showing that the grant is to the parent, in trust for the child, and without power of alienation by the parent. The appellant does not deny that a grant to one, for another, creates a trust; but seeks to find something in the language of the treaty, or deducible from its spirit and reason, which strips these words of their ordinary signification, and makes them operate an unrestrained grant to the parent. The only ground on which this can rest is, that the half-sections and quarter-sections are added to enable the parent to discharge the burden of supporting children whom he was under a legal obligation to support. But the word *child*, whether taken in its legal or in its ordinary sense, means the lineal descendant of another in the first degree, and is equally applicable to persons over and under twenty-one years of age; yet there is no obligation on the parent to support a child over the age of twenty-one, and hence there can be no propriety in saying that the grant was to the parent to enable him to discharge such obligation. Again, conceding that the word *child* was used as the synonym of *infant*, the provision made to the parent on account of a younger child, according to the reason contended for, should have been greater than that made on account of the older, because the burden of rearing and supporting the younger is greater than that of the older child. But the provision of the treaty is just the reverse; giving the half-section for the older, and the quarter-section for the younger child; thus showing that the grant was not intended as a bonus to the parent on account of the burden imposed on him.

Again, five years residence by *them*, meaning parent and children, is essential to a consummation of the conditions of the 14th article. If the word *child* be limited to include

those only who were under the age of twenty-one, this period of five years would nevertheless, in many instances, extend far beyond the majority of the children; and yet the parent loses control over the child when the latter attains his majority. This would be to make a grant to the parent on a condition which he cannot see performed—to annex a condition to a grant impossible of performance by the grantee. Residence being the condition to be performed, the power to perform·or to omit the condition must be in him who is to take. The thing to be rendered is in the nature of personal services, and the reward for the render goes with the services—the benefit accrues to him from whom the consideration moves—each is responsible for the consequences of his own action. It must be remembered, too, that this residence must be with the intention to become citizens, which, being purely·a matter of will, must be personal to the one exercising that will. The design of the treaty being to make permanent citizens of all who remained, the greater pecuniary inducement was necessarily held out to the older child, who would be less under the influence of his parent than the younger, would feel more keenly the loss of early ties and association, and would be more loth to abandon savage life, and to become amenable to the laws and customs of civilized life. And the additional provision of the article, requiring that the locations of the children should adjoin the location of the parent, seems to have been expressly designed to further the wish of the government that all the reservees should become good and contented citizens. If the interest of the parent alone had been consulted, his choice of location would have been enlarged as much as possible; but the interest of the child required that, in order to lessen the discontent and indisposition to remain after the removal of the tribe, so natural a result of his new condition, he should be placed in close proximity to the parent.

This construction of the 14th article is strengthened by a consideration of the provisions of other articles of the treaty. The 19th article secures reservations to the heads of families for improvements made by them; showing

that the grant, when made in consideration of services performed by the parent alone, is to him directly without regard to his children. The 17th article provides for an annuity, to be "divided and arranged to such as may not receive reservations under this treaty ;" that is, to *all* such, or at least all such as were twenty-one years old at its payment. This article evidently divides the whole tribe into two classes, annuitants and reservees; all are annuitants except reservees, and all reservees who are not annuitants. The other provisions of the treaty, respecting the mode of payment of this annuity, show that it was intended only for those members of the tribe who removed west of the Mississippi; and such has been the constant practical exposition of the treaty by the government in the disbursement of the annuity. If, then, the children of those who remain, although they render the consideration on which the grant of the half-sections and quarter-sections is made, are not entitled to these reservations, it follows that they alone, of all the tribe, lose everything under the treaty, and get nothing in return; for young and old share equally in all the benefits secured by the treaty to those who emigrate.

The appellant relies on the practice of the government in issuing patents under this article of the treaty, as conclusive of the question of construction. This practice amounts to nothing more than this: the agents of the United States, through ignorance or indolence, omitted to take down the names of the children of the locating parents; and the secretary of war, not having their names, did not issue the patents to them. When a treaty requires some further act by the government to give it effect, the action of the government in that particular may be some clue to its construction ; as in the payment of the annuity above referred to. But, when a right is defined and made perfect by the treaty, the subsequent conduct of the government can no more be a guide to interpret it, than the assertions of the grantor, made after his deed has passed, can be received against the grantee in aid of the construction of the deed. The treaty itself determines the rights of the parties under it, and is

the supreme law of the land; and to the judiciary alone. belongs the power to construe it. The treaty itself fixes. the grant, and the patent is merely the evidence that the terms have been complied with. If the patent had never issued, the rights of the parties would have been the same. But the treaty does not designate the particular lands to which each reservee may be entitled. That requires the subsequent act of severance of the land from the public domain, and conveyance of the legal title by patent. Hence, the complainants, being reservees but not patentees, cannot maintain ejectment, but must assert their rights in equity.

2. The allegations of the appellant's answer are not sufficient to entitle him to protection as a purchaser for valuable consideration without notice. Moreover, on the agreed facts, he is chargeable with implied notice of the complainants' rights, because the patent to Thomas Hall, conveying to him 2240 acres, shows on its face that it was issued under the 14th article of the treaty.—2 Sugden on Vendors, 293-4; Johnson v. Thweatt, 18 Ala. 747; Brewer v. Brewer & Logan, 19 Ala. 487; Center v. P. & M. Bank, 22 Ala. 755; Vattier v. Hinde, 7 Peters, 271; Kennedy v. Green, 3 My. & K. 699.

R. W. WALKER, J.—This case involves the construction of the 14th article of the treaty between the United States and the Choctaw Indians, concluded at Dancing Rabbit creek, 15th September, 1830. That article is in the following words:

"Each Choctaw head of a family, being desirous to remain and become a citizen of the States, shall be permitted to do so, by signifying his intention to the agent within six months from the ratification of this treaty; and he or she shall thereupon be entitled to a reservation of one section of six hundred and forty acres of land, to be bounded by sectional lines of survey; in like manner shall be entitled to one-half that quantity for each unmarried child which is living with him over ten years of age, and a quarter-section to such child as may be under ten years of age, to adjoin the location of the parent. If they reside

upon said lands, intending to become citizens of the States, for five years after the ratification of this treaty, in that case, a grant in fee simple shall issue. Said reservation shall include the present improvement of the head of the family, or a portion of it. Persons who claim under this article shall not lose the privilege of a Choctaw citizen; but, if they ever remove, are not to be entitled to any portion of the Choctaw annuity."—U. S. Statutes at large, 7th vol., p. 333.

William Hall was the " Choctaw head of a family," and, at the date of the treaty, had living with him seven children, of whom three were over, and four under, the age of ten years. In pursuance of the article above quoted, he claimed as his reservation three and a half sections of land, including the section on which he lived; and in making his claim, he reported to the agent of the United States (according to what is shown to have been the general practice in executing this article of the treaty) the number and ages, but not the names of his children. By virtue of the claim thus made, he secured a reservation of three and a half sections. No question arises in this case as to the title to the section on which Hall was living when the treaty was concluded. But in reference to the remaining two and a half sections embraced by the reservation, the question is, whether, under the treaty, Hall took them absolutely for himself, or whether his children living with him took legal or equitable estates therein which he could not convey.

If, under the treaty, an interest vested in the children, it is not necessary for us to decide whether the grant was meant to be directly to them, or to the parent in trust for them. In either event, the result, so far as the decision of this case is concerned, is the same.

It must be admitted, that the language of the treaty, and especially of this particular article, is clumsy and inartificial. We do not, however, concur with Mr. Attorney-General Legare, in the remark made by him in the opinion which is embodied in the transcript, that "the words are so extremely doubtful, as to be susceptible of either of the conflicting constructions insisted on."—At-

torney-Generals' Opinions, vol. 4, p. 107. The doubt we entertain is rather as to the nature, than the existence, of the right of the children. The article first provides, that the head of the family, who signifies his intention of becoming a citizen, "shall thereupon be entitled to a reservation of one section." It then proceeds—"In like manner shall be entitled to one-half that quantity, for each unmarried child living with him over ten." The word *for*, as here employed, if there were nothing in other parts of the article or treaty to explain it, would certainly be somewhat equivocal. Ordinarily, a grant to one, *for* another, creates a trust. But this particular grant follows, in immediate succession, a grant to the head of the family, which, it is admitted, is for himself absolutely; and the words here employed might, if unexplained, seem to indicate a mere enlargement, or extension, of the interest already granted. "*In like manner*, shall be entitled," &c. If these terms stood alone, or in connection only with the preceding part of the article, there might be some force in the argument, that *for*, as here used, means simply by reason, or on account of, and was intended to designate the child as the cause of an additional reservation to the parent, and not as the recipient of a distinct reservation for himself. But the words which immediately follow, shed light upon this obscure expression, and sufficiently indicate the sense in which it was employed. "And a quarter-section *to* such child as may be under ten." Here are words which admit of but one construction; and that is, that the child is the person entitled to the benefit of the reservation. This is made still more plain by the words which designate the locality of the reservations granted to or for the children. They are to "adjoin the location of the parent." What is the location of the parent? Obviously, we think, the section on which his 'improvement' is situated, and which is reserved for him in absolute right. The reservations of the children were to adjoin the location of the parent; and it is certainly a fair argument, that lands which were to adjoin the parent's can hardly be deemed lands of the parent.

This construction of the 14th article derives powerful

support from the 6th clause of the 19th article, which provides, that " children of the Choctaw nation residing in the nation, who have neither father nor mother, * * * * shall be entitled to a quarter-section of land, to be located under the direction of the president; and with his consent, the same may be sold, and the proceeds applied to some beneficial purpose for the benefit of said orphans." Thus it will be seen, that adopting the construction of the 14th article which we have indicated, the treaty secures reservations to all the children of the tribe; and the result is that equal distribution of favors which seems to have been one of the main purposes of the treaty. Upon the opposite construction, the treaty has designated a favored class of children, and confined the direct benefits which it bestows to them exclusively.

The design of the treaty was to make permanent citizens of those of the tribe who should remain in the States; and for this purpose, a bonus, in the shape of a reservation of land, is provided for all who continue to reside in the ceded territory with that intention. The contentment and comfort of the families remaining would obviously be promoted, if the possessions of the parent and his children should be near each other. The provision that the reservations should adjoin is altogether consistent with the idea, that a part of the reservations were to belong to the children; for the proximity of the lands to those of the father, would tend to keep them contented, and increase the probability of their becoming permanent citizens. Upon the supposition that the additional reservations were for the children, we can perceive a substantial reason for the provision, that they should adjoin the location of the parent. On the other hand, if all the reservations were for the parent exclusively, the benefit conferred would have been enhanced by allowing him a larger choice of location.

Other articles of the treaty confirm the idea, that the advantages secured by it to the Indians were not intended exclusively for adults, but that the interests of the children of the tribe were especially contemplated. Notice particularly the stipulations contained in the 20th article,

for the education by the United States of Choctaw youths, for the erection of school-houses, and for the annual payment of a sum for the support of teachers.

[2.] We do not perceive the force of the argument attempted to be founded on the construction which seems to have been given to this article of the treaty by the secretary of war, and the form of the patents which were issued by the government in carying it into effect, until a different form was prescribed by the act of 23d August, 1842.—5 U. S. Statutes at large, 513. Treaties are themselves the supreme law, and neither the legislative nor the executive department can settle legal rights arising under them. No proposition can be plainer, than that rights which are defined by, and have vested under a treaty, can neither be defeated nor impaired by an act of congress; much less by any practice adopted by the officers of government in executing the treaty. The government, and the agents of the government, are alike powerless to affect rights which have been granted by treaty. When, therefore, a case arises between individuals, involving rights growing out of a treaty, those rights are to be determined upon a judicial construction of the treaty; and this is to be settled by reference to its words and expressions. The practice of the war department, and the form in which the patents were issued, cannot change the meaning of the words, or control us in interpreting them.—Pickens v. Harper, 1 Sm. & Mar. Ch. 540; Attorney-Generals' Opinions, vol. 4, 107.

Our conclusion is, that it was the purpose of the treaty to make substantive and distinct provisions for the children; and that a single section of land (the one on which his improvement, or a part of it was situated) was the extent of the reservation to which the father was entitled for himself. We are supported in this construction by the opinion of the court in Pickens v. Harper, 1 Sm. & M. Ch. 539; see, also, Newman v. Harris & Plumer, 5 How. Miss. 564.

[3.] But, though the treaty is the paramount evidence of the rights secured by it, uncontrollable by any subsequent act or practice of the government or its officers;

still, it gives a mere inchoate title to land not severed from the public domain, or so designated as to be susceptible of identification. More than one head of a family might reside on the same section. The child's land is to adjoin the location of the parent, but on which side the treaty does not determine. The treaty, therefore, only establishes the existence and extent of the right, but does not designate the particular land. This designation of the particular land was to be by subsequent proceeding, and the title thereto conveyed by grant in fee simple. While, then, the treaty gives the right, it is the patent which conveys the title.—See West v. Cochran, 17 How. U. S. 403; Opinions of Attorney-Generals, vol. 3, p. 49.

[4.] In this case, the patent being "to William Hall and his heirs," conveys to him a legal estate in fee simple. But, inasmuch as the form of the patent cannot destroy the rights which vested under the treaty, the legal title which it conveys will be decreed by a court of equity to be held subject to these rights, and in trust for the persons to whom the land was intended to be secured by the treaty. The legal title being thus in the patentee, and not in the reservees, (the children,) the latter could not maintain ejectment for the recovery of the land, and their only remedy is in a court of equity.—See opinion of Attorney-General Legare, (Opinions of Attorney-Generals, vol. 4, p. 107;) West v. Cochran, *supra*; Cousin v. Blanc, 19 How. 202; Ballance v. Forsyth, 13 How. 18.

[5.] It is alleged in defense, that the defendant is a purchaser for valuable consideration without notice. The answer of the defendant shows, that when he made the purchase from Hall, he knew that Hall was the "Choctaw head of a family," and that his right to the land was claimed as having arisen under the treaty. It is well settled, that if the purchaser be put in possession of such facts concerning the title which the vendor offers to sell, as would cause a prudent man to inquire further before he would proceed with the purchase, he cannot claim the protection which is accorded to an innocent purchaser without notice.—Center v. P. & M. Bank, 22 Ala. 755; McGehee v. Gindrat, 20 Ala. 101. Information which

makes it the duty of a party to make inquiry, and shows where it may be effectually made, is notice of all facts to which such inquiry, if conducted with ordinary diligence and prudence, would have led.—Carr v. Hilton, 1 Curtis, C. C. R. 390; Ringgold v. Bryan, 3 Md. Ch. 488; Wilson v. McCullough, 11 Harris, 440; 1 Smith, N. Y. 354; Kennedy v. Green, 3 My. & K. 699. A purchaser has notice of what appears upon the face of every title-deed which constitutes a necessary link in his chain of title, and will not be allowed to deny notice by asserting that he had not read the deed.—Johnson v. Thweatt, 18 Ala. 747; Wailes v. Cooper, 24 Miss. 208; Tiernan v. Thurman, 14 B. Monr. 277. In the language of Lord Mansfield, "whoever wants to be secure when he makes a purchase, should inquire after and examine the title-deeds."—Kuck v. Hall, Dougl. 22. The defendant knew that the source of his vendor's title was the treaty. This treaty was the public law, with the provisions of which every citizen is presumed to be acquainted. Even if such were not the presumption, the defendant being informed that his vendor's title was derived from the treaty, it was his duty to examine it. Such an examination would have informed him that the right of Hall was confined to the single section on which his improvement was situated, and that all the rest of the land was for his children. If, then, the defendant was not in fact cognizant of the rights of the complainants, his want of knowledge was the result of his failure to make an inquiry which it was his duty to make, and a court of equity will treat him as if he actually had notice.—McGehee v. Gindrat, 20 Ala. 100; Herbert v. Hanrick, 16 Ala. 597.

The decree is affirmed.